PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
David W. Reid, Bar No. 267382
dreid@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA 92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff and Proposed Class

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SONYA VALENZUELA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THE KROGER CO., an Ohio corporation; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 2:22-cv-6382-DMG-AGR<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT ("CIPA")**<br><br>Filed: August 3, 2022<br>Removed: September 7, 2022 |

## INTRODUCTION

Defendant The Kroger Co. ("Defendant") secretly enables and allows a third-party spyware company to wiretap and eavesdrop upon the private conversations of everyone who communicates through the chat feature at https://www.kroger.com/ (the "Website"). The spyware company then exploits and monetizes that data by sharing it with other third parties who use the private chat data to bombard the unsuspecting visitor with targeted marketing.

Defendant does this without visitors' informed consent. As a result, Defendant has violated the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630 *et seq.*

## JURISDICTION AND VENUE

1. Plaintiff Sonya Valenzuela ("Plaintiff") does not dispute Defendant's grounds for removal and the propriety of this Court's jurisdiction and venue pursuant to 28 U.S.C. §§ 1332(a), 1441, 1446, and 1453.

## PARTIES

2. Plaintiff is a resident and citizen of Murrieta, California. In July 2022 while physically within California, Plaintiff visited Defendant's Website using a smart phone and conducted a brief conversation with an agent of Defendant through the Website's chat feature. Plaintiff was not advised that the chat was monitored, intercepted, or recorded, nor did she consent thereto.

3. Defendant, an Ohio corporation, is "one of the world's largest food retailers, with fiscal 2022 sales of $148.3B." *See* https://ir.kroger.com/home/default.aspx (last visited Jul. 6, 2023). Defendant's brands include Kroger, Ralphs and Food4Less, with hundreds of locations in California alone. Defendant affects commerce within the state of California and with California residents. Defendant also owns, operates, and/or controls the Website, which at relevant times, offered an online "chat" feature for consumers to communicate directly with Defendant through the Website.

4. The above-named Defendant, along with its affiliates and agents, are collectively referred to as "Defendant." The true names and capacities of the Defendants

sued herein as Doe Defendants 1 through 10, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names. Each of the Defendants designated herein as a Doe is legally responsible for the unlawful acts alleged herein. Plaintiff will seek leave of Court to amend the Complaint to reflect the true names and capacities of the Doe Defendants when such identities become known.

5. Plaintiff is informed and believes that at all relevant times, every Defendant was acting as an agent and/or employee of each of the other Defendants and was acting within the course and scope of said agency and/or employment with the full knowledge and consent of each of the other Defendants.

## FACTUAL ALLEGATIONS

### A. Background of CIPA.

6. CIPA prohibits both wiretapping and eavesdropping of electronic communications without the consent of all parties to the communication. "'[T]he right to control the nature and extent of the firsthand dissemination of [one's] statements'" is viewed by the California Supreme Court "as critical to the purposes of Section 631[.]" *Javier v. Assurance IQ, LLC*, 2023 WL 114225, at *6 (N.D. Cal. Jan. 5, 2023) (Breyer, J.) (quoting *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985)); *Ribas*, 38 Cal. 3d at 360-61 ("a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device"). "[U]nder Section 631, it has always mattered who is holding the tape recorder[.]" *Javier*, 2023 WL 114225, at *6.

7. Compliance with CIPA is easy, and most website operators comply by conspicuously warning visitors if their conversations are being recorded, intercepted, or eavesdropped upon.[1]

---

[1] https://www.leechtishman.com/insights/blog/the-california-invasion-of-privacy-act-californias-wiretap-act/ ("*[C]ompliance [with CIPA] is not difficult. A business must take certain steps, as part of its privacy program, to ensure that **any time the business is gathering**, either automatically, or **with a chat feature**, personal data of a consumer/website visitor, that it obtains valid consent consistent with the*
Continued on the next page

8. Unlike most companies, Defendant *ignores* CIPA. Instead, Defendant enables and allows a third party that has no corporate affiliation with Defendant to eavesdrop on all such conversations. Why? Because, as one industry expert notes, "*Live chat transcripts are the gold mines of customer service. At your fingertips, you have valuable customer insight to make informed business decisions. . . .* **When people are chatting, you have direct access to their exact pain points.**"). *See* https://www.ravience.co/post/improve-marketing-roi-live-chat-transcripts (last visited Jul. 6, 2023) (emphasis added).

9. Defendant's actions are not incidental to facilitating e-commerce, nor are they undertaken in the ordinary course of business. To the contrary, as noted above, Defendant's actions violate industry norms and the legitimate, reasonable expectations of consumers.

**B. Defendant Allows Emplifi to Intercept Consumers' Chats During Transmission Through Its "Astute Bot" Chat Service.**

10. To enable eavesdropping, Defendant has allowed a third party, Emplifi, to embed its chat technology code, "Astute Bot" into the chat feature offered on Defendant's Website. Indeed, whenever a consumer chats via Defendant's Website, the chat is routed *through* Emplifi's Astute Bot servers so they may simultaneously collect a transcript of that chat, along with other user data, in real time and save it for later access:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

Continued from the previous page
***holdings and determinations of the courts interpreting CIPA*** *and other applicable Data Privacy laws.*") (last visited Jul 6, 2023) (emphasis added).

**Figure 1:**



**Figure 2:**

11. The above Figure 2 confirms that the unencrypted chat transcripts are being received and stored by Astute Bot. The Astute Bot secret code is a type of automatic routing software that automatically acquires and transmits user chat communications to Astute Bot without any active input from either Defendant's employees, agents, or human representatives, or Emplifi's employees, agents, or human representatives. Astute Bot acquires Website visitors' chat communications by first having its software to route them to Astute Bot's own computer servers that it owns, controls, and maintains. The secret code enables and allows Astute Bot/ Emplifi to secretly intercept in real time, eavesdrop upon, and store transcripts of consumers' chat communications they *think* they are having with Defendant, even when such conversations may be private and personal. Defendant neither informs visitors of this conduct nor obtains their consent to these intrusions.

12. Indeed, Emplifi admits that it receives and records chat transcripts. *See* https://emplifi.io/products/customer-care/self-service-chatbots ("When agents can see the history of a customer's chatbot interactions, they can step in to resolve the issue at hand. Our chatbot makes this context immediately available within Emplifi Agent…. Self-service may be the quickest path, but what if customers need a live agent? Automated routing lets customers escalate to a live agent or subject matter expert, and continue the conversation right where it left off.") (last visited Jul. 6, 2023).

13. Astute Bot even tracks when a user is *typing* their message – meaning that even if a user opts not to press "enter" to send their chat message, or deletes it, Astute Bot is still retaining a log of the message typed. The below Figure 3 shows Astute Bot capturing a message while it was in the process of being typed:

**Figure 3:**

```
▼Request Payload     view source
  ▼ {botAccountServiceId: "DwqhSBXvkIfNezerRLU_8g", conversationId: 63832673, utterance: "How can I "}
     botAccountServiceId: "DwqhSBXvkIfNezerRLU_8g"
     conversationId: 63832673
     utterance: "How can I "
```

14. The chat prompts users to disclose personally identifying information ("PII") when initiating the chat. These details are sent in an unencrypted format to Astute Bot:

**Figure 4:**



**Figure 5:**



15. After minimizing the chat, data is logged on the Defendant's servers:

**Figure 6:**



16. The data from the request shows the Website has integrated the Google Global Site Tag and that Defendant receives PII from users:

**Figure 7:**

17. The Google Global Site Tag is a JavaScript library provided by Google that acts as a unified tagging system. It helps streamline the implementation of various Google services, including Google Analytics, Google Ads conversion tracking, and more. This

means that the Website can use a single code snippet instead of having to import each Google service individually.

18. One might reasonably wonder why Emplifi would be interested in intercepting and recording the Website chat interactions between Defendant and unsuspecting visitors to Defendant's Website. As shown below, it all about money.

19. Emplifi admits its software is integrated with social media platforms like Meta/Facebook. *See* https://docs.emplifi.io/platform/latest/home/how-to-connect-facebook-insights-publishing-permis (last visited Jul. 6, 2023). The integration allows various software sub-systems to share data to operate as a unified system. According to Bloomberg.com, this is all part of Meta's secret "plan to profit from private chats." As Bloomberg explained, Meta's software integration "can manage customer messages from multiple services on one central dashboard. That's central to Meta's plan to make money off of its two messaging apps, WhatsApp and Messenger." *See* https://www.bloomberg.com/news/articles/2022-02-15/meta-closes-1-billion-kustomer-deal-after-regulatory-review (last visited Jul 6, 2023) (emphasis added).

20. So how does it work? First, Meta identifies "user interests" by monitoring a collection of "offsite" user activity such as website visits and interactions (including private chat communications between Defendant and visitors) by "integrating" its software with Emplifi's software. Second, Meta generates revenue by selling advertising space through its subsidiaries' ability to identify those offsite user interests. Third and finally, after the chat transcripts intercepted by Emplifi are provided to Meta through "integration", Meta brands like Facebook and WhatsApp bombard the unsuspecting Website visitors with targeted advertising based upon the user's Website visits and interactions.

21. Through the preceding acts, Meta subsidiaries can freely boast that they can "Transform your support center into a profit generator by bulk messaging specific customer segments based on your unique data…to reengage dissatisfied customers." *See e.g.,* https://www.kustomer.com/product/customer-service/ (last visited Jul. 6, 2023).

Indeed, all of the schemers – Defendant, Emplifi, and Meta – all profit from secretly exploiting the chat data through targeted social media advertising because "Targeted advertising allows brands to send different messaging to different consumers based on what the brand knows about the customer. The better a brand can demonstrate that it understands what its customers want and need, the more likely customers respond to advertising and engage with the brand…. Social media targeting helps brands leverage consumers' behavior on the web, search engines, and social media sites to present ads that reflect consumer interests." *See* https://www.adroll.com/blog/what-is-targeted-advertising#:~:text=Targeted%20advertising%20allows%20brands%20to,and%20engage%20with%20the%20brand (last visited Jul. 66, 2023).

22. As such, Emplifi does more than merely provide a storage function for Website users' chat communications with Defendant. It is more than the proverbial "tape-recorder" in the hand of Defendant. Instead, Emplifi uses its record of Website users' interaction with Defendant's chat feature for data analytics and marketing/advertising to consumers. Emplifi's exploitation, monetization, use of, and interaction with the data it gathers through the chat feature on Defendant's Website in real time makes it a third-party interceptor and eavesdropper known to and enabled by Defendant under CIPA, rather than a mere extension of Defendant and/or party to the communication with Website visitors.

23. Given the nature of Defendant's business, visitors may share personal and/or confidential data, in addition to personally identifying information, with Defendant via the Website chat feature.

24. Defendant did not inform Class members that Defendant was secretly allowing and aiding Emplifi to intercept and eavesdrop on the conversations during transmission, or that Emplifi provided data from such transcripts to Meta and similar entities through "integration" of their softwares.

25. Defendant did not obtain Plaintiff's or the Class members' express or implied consent for the preceding intrusions, nor did Plaintiff or Class members know at the time of the conversations of Defendant's conduct.

26. Nevertheless, Defendant was acutely aware of Emplifi's practices and procedures with respect to consumer data, because these were among the features that Emplifi specifically advertised to its customers, such as Defendant.

27. The Astute Bot is advertised to customers, such as Defendant, as a branded tool that mimics the look and feel of the customer's own brand, thereby deceiving consumers into believing they are interacting directly with customer, when in fact they are providing their information to Emplifi. See https://emplifi.io/products/customer-care/self-service-chatbots (last accessed April 18, 2024):

> **Branded look and feel**
> Configure the look and feel of Emplifi Bot to match your own brand standards, including logos, colors, fonts, and even your CSS, for a consistent visual experience for customers.

28. Additionally, Emplifi specifically advertises to its prospective clients, like Defendant, that its services share data with Facebook Messenger, providing information taken from chat conversations on Defendant's Website directly with Meta in the process, all via the Astute Bot:

> **Reach your customers with the engagement they want, when they want it**
>
> Facebook Messenger users can opt in to get recurring notifications on content they're interested in. Deliver personalized experiences to your customers, directly from **Emplifi Bot**.

29. Emplifi specifically informs customers (such as Defendant) that they can access consumer information within Emplifi's platform and then use this platform to message consumers on the social media platform of their choice—all while the communications are actually handled by Emplifi masquerading as its customer.

**Conversations**

View existing conversations between your bots and your customers. You can also use this page to direct message a customer on their social channel without leaving Emplifi Bot. For more information, see Conversations.

30. Additionally, Emplifi and its partners leverage consumer information like Plaintiff's to train and improve their chatbot functionality for other unknown third parties—Emplifi's other clients. Indeed, this ability to leverage conversational data gathered from other third parties is specifically one of the features Emplifi advertises to its clients, as this allows them to train new chatbots cheaper and more efficiently than if they were trained without relying on other consumer data.

31. Specifically, Emplifi advertises that its customers, like Defendant, can use information that consumers provide to "get a better idea of the questions" that consumers are asking and "what additional intents it may be helpful to author" in the chatbots. https://docs.emplifi.io/platform/latest/home/intents-analytics (last visited April 18, 2024).

32. In other words, not only do prospective customers like Defendant know that Emplifi shares consumer data with third parties, this is something that they specifically welcome for its cost-saving and time-saving features.

33. Upon information and belief, Defendant knew of Emplifi's practice of sharing consumer data with third parties, in part because this is what allowed Emplifi to deploy a chatbot so quickly and cheaply for Defendant.

34. Defendant likewise knew that its own customers' data would similarly be given to Emplifi and that Emplifi would similarly share it with other third parties, as detailed herein.

/ / /

## CLASS ALLEGATIONS

35. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

**All persons within the state of California who within the statute of limitations period: (1) communicated with Defendant via the chat feature on Defendant's Website; and (2) whose communications were recorded and/or eavesdropped upon without prior consent.**

36. <u>NUMEROSITY</u>: Plaintiff does not know the number of Class Members but believes the number to be in the tens of thousands, if not more. The exact identities of Class Members may be ascertained by the records maintained by Defendant.

37. <u>COMMONALITY</u>: Common questions of fact and law exist as to all Class Members, and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

   a. Whether Defendant caused Plaintiff's and the Class's electronic communications with the Website to be recorded, intercepted and/or monitored;
   b. Whether Defendant violated CIPA based thereon;
   c. Whether Plaintiff and Class Members are entitled to punitive damages pursuant to Cal. Civil Code § 3294; and
   d. Whether Plaintiff and Class Members are entitled to injunctive relief.

38. <u>TYPICALITY</u>: As a person who visited Defendant's Website and had her electronic communications recorded, intercepted and monitored, Plaintiff is asserting claims that are typical to the Class.

39. <u>ADEQUACY</u>: Plaintiff will fairly and adequately protect the interests of the members of The Class. Plaintiff has retained attorneys experienced in the class action

litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

40. <u>SUPERIORITY</u>: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

## CAUSE OF ACTION

## Violations of the California Invasion of Privacy Act

## Cal. Penal Code § 631(a)

41. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

42. "Any person who, by means of any machine, instrument, or contrivance, or in any other manner,… [ii] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [iii] who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or [iv] who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine . . . ." *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1080 (C.D. Cal. 2021) (Holcomb, J.) (line breaks and headings of clauses added for ease of reference) (quoting Cal. Penal Code § 631(a)).

43. Section 631(a) of the California Penal Code applies to internet communications and thus applies to Plaintiff's and the Class's electronic communications with Defendant's Website. "Though written in terms of wiretapping, Section 631(a) applies to Internet communications. It makes liable anyone who 'reads, or attempts to

read, or to learn the contents' of a communication 'without the consent of all parties to the communication.'" *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. 2022); *Yoon*, 549 F. Supp. 3d at 1080 ("Courts agree … that CIPA § 631 applies to communications conducted over the internet.") (citing *Matera v. Google Inc.*, 2016 WL 8200619, at *18 (N.D. Cal. Aug. 12, 2016) (Koh, J.) (holding that second clause of section 631(a) "encompasses email communications, which pass over wires, lines, or cables")); *In re Google Inc. Gmail Litig.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013) (Koh, J.) ("the Court finds that section 631 of CIPA applies to emails"); *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 826 (N.D. Cal. 2020) (Labson Freeman, J.).

44. Emplifi's software embedded on Defendant's Website to record and eavesdrop upon the Class's communications qualifies as a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct alleged herein. *See In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 937 (N.D. Cal. 2015) (stating that "***it is undeniable that a computer may qualify as a 'machine'***" within the meaning of section 631(a)) (emphasis added), *aff'd in part and rev'd in part on other grounds*, 956 F.3d 589 (9th Cir. 2020).

45. Defendant knew, because Emplifi specifically advertised to it and because this was part of the reason why Defendant engaged Emplifi's services, that Emplifi recorded consumer data, utilized it to perform analytics and train its own chatbots, and shared information with third parties such as Meta and its own strategic partners.

46. Defendant provided substantial assistance to Emplifi's unlawful use of consumer data in that Defendant allowed Emplifi to embed its chatbot software onto its Website, provided customized branding to disguise Emplifi's chatbot as its own software, and knowingly empowered Emplifi to record consumer conversations, perform analytics on the same, and share consumer data with other third parties such as Meta.

47. At all relevant times, Defendant intentionally caused the internet communication between Plaintiff and Class members with Defendant's Website to be recorded. Defendant also aided, agreed with, employed, or conspired with at least one third party to wiretap and/or eavesdrop upon such conversations during transmission and in real time by voluntarily embedding Emplifi's Astute Bot software code on Defendant's Website.

48. Defendant knows that Emplifi, through software, captures the electronic communications of visitors to Defendant's Website, and pays it to conduct these activities.

49. Plaintiff and Class members did not expressly or impliedly consent to any of Defendant's or Emplifi's actions.

50. In a materially identical case, a court recently held that the above-described allegations state viable claims for violations of section 631(a) of CIPA. *See Byars v. The Goodyear Tire & Rubber Co.*, No. 5:22-cv-01358-SSS-KKx, 2023 WL 1788553, at *4 (C.D. Cal. Feb. 3, 2023) (Sykes, J.) ("*Byars contends that Goodyear, using a third-party service, "intercepts in real time" a website visitors' chat conversation. . . . Byars alleges that, using the chat conversation, website visitors share sensitive personal information. . . . . Because Byars has pled sufficient facts to show the contents of the communications and that the communications were intercepted, Byars has sufficiently stated a claim under § 631(a).*") (emphasis added).

51. Defendant's conduct constitutes numerous discrete violations of Cal. Penal Code § 631(a), entitling Plaintiff and/or Class members to injunctive relief and statutory damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1. An order certifying the Class, naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class counsel;
2. An order declaring Defendant's conduct violates CIPA;

3. An order of judgment in favor of Plaintiff and the Class and against Defendant on the causes of action asserted herein;

4. An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

5. Statutory damages pursuant to CIPA;

6. Punitive damages;

7. Prejudgment interest;

8. Reasonable attorneys' fees and costs; and

9. All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

Dated: April 18, 2024                     PACIFIC TRIAL ATTORNEYS, APC

By: _____
Scott. J. Ferrell
Attorneys for Plaintiff